# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00795-SCT

*JAMES ROBERT SANDERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/2001 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EUGENE A. PERRIER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | G. GILMORE MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION | AFFIRMED - 01/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Having been indicted, tried, convicted and sentenced for murder and armed robbery, James Robert Sanders (Sanders) appeals from the final judgment of the Circuit Court of Warren County, claiming that the circuit court erred in holding that because Sanders had re-initiated conversation with law enforcement after he requested an attorney, his waiver of rights was effective, and thus, his confession could be admitted. Finding the correct standard was applied in determining Sanders's confession was admissible, we affirm the judgment of the circuit court.

## STATEMENT OF THE CASE

¶2.     On March 13, 2000, James Robert Sanders (Sanders) was arrested for the murder of Paul Moore (Moore) after Sanders's brother, Greg, told local law enforcement where Moore's body could be found. After his arrest, Sanders confessed that he had shot Moore but the killing was not intentional.

¶3.     On May 2, 2000, Sanders was indicted on the charges of murder (Count I) and armed robbery (Count II). Sanders filed a motion to suppress his confession, and a hearing was held prior to the trial. The trial court denied Sanders's motion and allowed the confession to be admitted into evidence. The trial began on March 26, 2001, and at the conclusion of the trial, the jury found Sanders guilty of the crimes of murder and armed robbery. Two days after the guilty verdicts were returned, the circuit judge sentenced Sanders to a term of life imprisonment for murder (Count I)[1] and to a term of life imprisonment without parole for armed robbery.[2] Sanders filed a motion for a judgment notwithstanding the verdict, or in the alternative, a new trial. Sanders also asked the trial court to set aside the verdict and find him guilty of manslaughter, or in the alternative, grant him a new trial. Upon the trial court's denial of all post-trial motions, Sanders appealed to this Court, raising only one issue which has been restated for the sake of clarity:

**WHETHER THE CIRCUIT COURT ERRED IN DENYING SANDERS'S MOTION TO SUPPRESS AND IN ADMITTING INTO EVIDENCE SANDERS'S RECORDED AND TRANSCRIBED CONFESSION.**

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶4.     The substantive facts of this case are not in dispute on this appeal. On the night of February 18, 2000, Sanders lured Moore into a remote wooded area in Warren County. Once they reached the woods,

---

[1]*See* Miss. Code Ann. § 97-3-21 (Rev. 2000)

[2]Pursuant to Miss. Code Ann. § 97-3-79 (Rev. 2000), the jury had "unanimously fix[ed] [Sanders's] punishment for life in the state penitentiary;" therefore, the circuit judge sentenced Sanders to life without parole for armed robbery pursuant to Miss. Code Ann. § 47-7-3(1)(d)(ii).

Sanders's brother, Greg, led the way with Sanders bringing up the rear. Greg testified he heard the click of a gun, and when he turned around, Sanders had the gun aimed at the back of Moore's head and fired. Although Sanders claims he and Moore were in the midst of a heated argument, Greg testified he never heard any raised voices. Sanders and his brother left the body in the woods and drove away in Moore's car. Sanders claimed he never touched Moore's body, nor did he take anything from him, but Sanders testified he did remember his brother, Greg, throwing Moore's pager out of the car window as they were leaving the scene. Moore's pager and wallet were both missing from the crime scene.

¶5. In due course, Sanders filed a motion to suppress his confession claiming the statement "was not freely and voluntarily given but was the product of duress and coercion, physical and mental fatigue, torture and harassment, coupled with promises of favor made by the Sheriff in order to get him to waive his rights and give a statement, without the benefit of counsel. . . ." Pursuant to the motion, the trial court conducted a pre-trial suppression hearing. The following recitation of facts is gleaned from the transcript of that suppression hearing.

¶6. On March 13, 2000, at the request of the Warren County Sheriff's Department, the Rankin County Sheriff's Department arrested James Sanders. Sanders was advised of his rights by Rankin County Sheriff Ken Dickerson. He was then placed in the back of a patrol car and taken to Sutherland's Lumber Company in Pearl where he was turned over to the Warren County Sheriff's Department. Both Sheriff Dickerson and Rankin County Investigator Chad Dixon testified that Sanders never made a statement of any kind in their presence, nor did he request an attorney. Sheriff Dickerson and Investigator Dixon also testified Sanders was informed that he was under arrest for capital murder.

¶7. Sheriff Martin Pace and Undersheriff Jeff Riggs of the Warren County Sheriff's Department transported Sanders back to Warren County. Sheriff Pace informed Sanders of his rights as soon as

3

Sanders was transferred into his custody. Sheriff Pace recorded those rights as he gave them through the E-911 Dispatch Center in Vicksburg. A printout from the E-911 recording indicates the time and date that the rights were given. There was also a recording made of Sheriff Pace advising Sanders of his rights. Sheriff Pace testified that no interrogation or questioning occurred during the trip from Rankin County to Warren County. Both Sheriff Pace and Undersheriff Riggs testified they did not recall Sanders ever requesting an attorney while Sanders was in their custody. Both officials also testified no promises were made to Sanders in exchange for his testimony, nor was he coerced or tortured in any way.

¶8. Sheriff Pace was questioned regarding Sanders's statement made to him the night Sanders was arrested. Although Sheriff Pace testified he did not recall Sanders ever requesting an attorney, he was asked to refer to Sanders's confession where Sanders stated "requested a lawyer but now I've [sic] waiving those rights."

| MARTIN PACE | James, I first had contact with you this evening in Rankin County in the presence of Sheriff Ken Dickerson and a number of his deputies. As soon as you were in my car with Undersheriff Jeff Riggs and myself, I advised you of some rights. Do you recall that ? |
|---|---|
| JAMES SANDERS | Yes sir. |
| MARTIN PACE | And what was your response to that? |
| JAMES SANDERS | Uh. . .at the time I said that I understood and. . . |
| MARTIN PACE | Okay. |
| JAMES SANDERS | . . .requested a lawyer but now I've [sic] waiving those rights. |
| MARTIN PACE | Okay, which brings me to this point. I read you rights and you made that statement and then at some point before we got back to Vicksburg you said that you would like to talk to me if it was just me, is that correct? |

JAMES SANDERS     Correct.

MARTIN PACE       Okay, and was there any coercion or for that matter, even any conversation leading up to that?

JAMES SANDERS     No sir.

Sheriff Pace stated at the suppression hearing that he still did not recall a conversation where Sanders ever requested an attorney, but if Sanders did request an attorney, he would have to assume it would have been in response to their first contact with Sanders.

¶9.     At the suppression hearing, Sanders attempted to refute the testimony of the law enforcement officials. He testified that after he was arrested by the Rankin County Sheriff's Department and he was read his rights by Sheriff Dickerson, he asked the sheriff if he could have a lawyer. He claims the sheriff informed him that would all be taken care of in Warren County. Sanders testified he was read his rights by Sheriff Pace when he was placed into the custody of the Warren County Sheriff's Department. He stated he understood the rights and was even able to repeat them back to Sheriff Pace. On direct examination Sanders testified at the suppression hearing:

Q.      And what, after the, as you were being transported to Vicksburg, what occurred between you and the Sheriff and the Under Sheriff?

A.      We were in the car for about an hour and a whole bunch of different things occurred. After we got in motion and we took off, we didn't say anything for a good couple of minutes. I mean, it was just dead silence in the car. *And he asked me if there was anything that I wanted to talk about.* He said that he knows that there are two sides to every story and if I wanted to say something it would be okay. And I told him - -

Q.      Who is he?

A.      Martin Pace.

Q.      Okay and what did you say at that time?

A.      *I told him at that time that I wasn't trying to be rude  and I'm not trying to be hard or anything but I think I need to get a lawyer first.*  And he didn't say anything else for a few more minutes.

Q.      And did he try further to interrogate you further there after?

A.      I mean, he was probably, in fact, the nicest guy you would ever meet on this trip. Ah, I mean, we talked a pretty good bit about my grandfather and stuff because he knew my grandfather.  I talked with Riggs for a little while about, you know, my grandmother and everything else. *And I asked him something about the charge, I don't remember exactly what it was but I was told that I was under arrest for capital murder.*  And I was asking him about the variations between first degree and second degree murder. And he explained to me that in Mississippi there was no first or second degree murder or anything like that, it was capital murder and murder, and manslaughter, and that was it.  Ah, he told me that if (sic) would go ahead and talk with him that he would see to it that I just got a murder charge and that way it wouldn't be capital and that way there wouldn't be any death penalty involved in it or anything like that. There's just conversation, is the best I can put it.  *A couple of minutes after that I told him that if that was the case I would talk to him, just him, and nobody else but him and I wasn't going to promise him anything.*

(emphasis added).

¶10.    Sanders was questioned regarding the confession he made the night he was arrested.  He testified that he remembered waiving his rights and issuing the statement. He also testified that at the conclusion of his confession he stated he was made no promises and no one coerced him into making the statement.

MARTIN PACE          Let me ask you this in conclusion. This is just a re. . .recover what we talked about in the beginning. Is it your statement that this has been a. . .a true and voluntary statement on your part? Is what you've told me tonight the truth?

JAMES SANDERS     Yes sir.

MARTIN PACE          And have you told me this for any reason other than you wanted to talk to me?

JAMES SANDERS     No sir.

MARTIN PACE          And are you satisfied that your rights have been protected and that you had. . .

6

JAMES SANDERS    And I've had every opportunity to get it right if I wanted.

¶11.    At the conclusion of the suppression hearing, the trial court found that Sanders made an offer to talk with the Sheriff regarding the death of Paul Moore. The trial court also found the only evidence presented to the court that Sanders had ever requested an attorney came from Sanders. The trial court stated both Sheriffs' Departments denied Sanders ever made such a request in their presence.[3] Therefore, the trial court held that Sanders waived his right to an attorney when he told the Sheriff he wanted to talk to him when they arrived at the station. Pursuant to *Wilcher v. State*, 697 So. 2d 1123 (Miss. 1997); *Morgan v. State*, 681 So. 2d 82 (Miss. 1996); *Balfour v. State*, 598 So. 2d 731 (Miss. 1992); and *Gentry v. State*, 416 So. 2d 650 (Miss. 1982), the trial court found no Sixth Amendment violation.

¶12.    The trial court also determined according to the testimony that there was no evidence of coercion or torture and that Sanders voluntarily, freely and intelligently waived his rights when he gave his statement. Therefore, there was also no Fifth Amendment violation. Thus, the trial court denied the motion to suppress.

## DISCUSSION

¶13.    Sanders argues that he requested legal counsel after being informed of his constitutional rights by the Sheriff of Warren County. Sanders also claims the sheriff promised not to charge him with capital murder if he would give a statement regarding the death of Paul Moore. Sanders argues his constitutional

---

[3]In *Agee v. State*, 185 So.2d 671, 673 (Miss. 1966), this Court made clear that once the State makes out a prima facie case on the voluntariness of the confession, and once the defendant offers testimony to refute the voluntariness of the confession, the State must offer "all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness." The record reveals that all necessary officers were called by the State at the suppression hearing. *See also Thorson v. State*, 653 So.2d 876 (Miss. 1995); *Lettelier v. State*, 598 So.2d 757 (Miss. 1992); *Scott v. State*, 382 So.2d 1091 (Miss. 1980).

7

rights were violated when the sheriff pursued the interrogation after Sanders requested an attorney without a significant intervening event or substantial passing of time.

¶14.	The State argues even if Sanders did request an attorney, he re-initiated conversation with the sheriff regarding the crime, and thus, his later waiver of rights was effective. The State also correctly notes Sanders inaccurately states the law when he claims that if he was unable to consult with legal counsel, an "equally significant intervening event must have occurred."

¶15.	This Court in *Baldwin v. State*, 757 So.2d 227 (Miss. 2000), discussed the heavy burden which must be met in order for an appellate court to overturn a trial court's decision regarding a motion to suppress:

> A trial court is also given deference in the admissibility of an incriminating statement by a criminal defendant. In *Hunt v. State*, 687 So.2d 1154, 1160 (Miss. 1996), this Court held that the defendant seeking to reverse an unfavorable ruling on a motion to suppress bears a heavy burden. The determination of whether a statement should be suppressed is made by the trial judge as the finder of fact. *Id.* "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992); *Alexander v. State*, 736 So.2d 1058, 1062 (Miss. Ct. App.1999).

*Baldwin*, 757 So.2d at 231. "Where, on conflicting evidence, the lower court admits a statement into evidence this Court generally must affirm." *Dancer v. State*, 721 So.2d 583, 587 (Miss. 1998) (citing *Morgan v. State*, 681 So.2d 82, 87 (Miss. 1996)).

¶16.	The United States Supreme Court and this Court have consistently held when a suspect invokes his right to counsel, all interrogation must cease until the lawyer is present, unless the suspect himself reinitiates communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880,

8

68 L.Ed.2d 378 (1981); *Grayson v. State*, 806 So. 2d 241 (Miss. 2001); *Mettetal v. State*, 602 So. 2d 864 (Miss. 1992). The United States Supreme Court in *Edwards* stated that:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police--initiated custodial interrogation even if he has been advised of his rights. [An accused], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484-85, 101 S.Ct. at 1884-85.

¶17.    In *Mettetal v. State*, 602 So. 2d 864 (Miss. 1992), the defendant, after killing a Panola County Deputy Sheriff in an attempt to escape custody, made a full confession and waiver of rights to law enforcement officials. Mettetal filed a pre-trial motion to suppress his statement, but his motion was denied. *Id.* at 867. At the hearing, Mettetal argued he made repeated requests for an attorney, but he was never provided with legal counsel. *Id.* Law enforcement officials testified Mettetal never requested an attorney, and had he made such a request, the interrogation would have stopped and an attorney would have been provided. *Id.* at 867-68. This Court held the trial court used the correct standard in denying the motion to suppress. *Id.* at 868. Mettetal testified he understood his rights, and his contention that he asked for an attorney was refuted by three different law enforcement officials. *Id.*

¶18.    In *Grayson v. State*, 806 So. 2d 241 (Miss. 2001), the defendant was interrogated by law enforcement officials and requested a lawyer four times before the interview ceased. However, several days later the defendant re-initiated conversation with the Sheriff's Department and made a written statement during the interview. *Id.* at 246-47. This Court held the defendant "clearly waived any right to an attorney he might theoretically have had at the time he confessed." *Id.* at 248.

¶19. According to the record, especially Sanders's own testimony at the suppression hearing, Sanders did not request an attorney, if he requested an attorney at all, until after Sheriff Pace asked him if he would like to discuss his arrest. He stated he would rather wait until his attorney was present. His statement then indicates that Sanders re-initiated the conversation with the sheriff and undersheriff by discussing his charges and the possible punishment he could receive. The trial court used the correct standard in finding that Sanders offered to talk to the sheriff after being advised of his constitutional rights, and thus, waived his Sixth Amendment right to counsel.

¶20. Sanders also claims his statement was not voluntary due to the fact he was promised a charge of murder instead of capital murder if he confessed. However, both Sheriff Pace and Undersheriff Riggs testified no promises were made to Sanders to induce him to give a statement. The trial court again used the correct standard in finding Sanders's statement was given freely and voluntarily. He was advised of his rights at least three times, and on one of those occasions was able to recite his rights back to the sheriff. In *Crawford v. State*, 716 So. 2d 1028, 1037 (Miss. 1998), this Court stated:

> [W]hether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence. *Balfour v. State,* 598 So.2d 731, 742 (Miss. 1992).

The trial court's ruling is supported by the record and, therefore, is affirmed by this Court.[4]

## CONCLUSION

¶21. The trial court did not err in admitting the recorded and transcribed confession of Sanders. Although he claimed to have requested an attorney even though no law enforcement official recalled such

---

[4]The record clearly reveals that during the closing arguments on the motion to suppress, the trial judge was keenly aware of the fact that the State had the burden of proving beyond a reasonable doubt, under the totality of the circumstances, the voluntariness of Sanders's confession. *Baldwin v. State*, 757 So.2d at 234-35.

a request, Sanders re-initiated conversation with the sheriff regarding his charges. There was no evidence to support Sanders's claim that his confession was involuntary. Because the trial court used the correct standard to determine there had been no constitutional violations suffered by Sanders, the trial court's ruling on the voluntariness of Sanders's confession is affirmed by this Court. Accordingly, the end result is that Sanders's convictions and life sentences for murder and armed robbery are affirmed.

¶22. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY WITH A DEADLY WEAPON AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE OR EARLY RELEASE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ AND GRAVES, JJ., CONCUR. EASLEY, J., NOT PARTICIPATING.**